FILED
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**December 20, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

---

ELIZABETH WRIGHT-SMITH,

      Petitioner,

v.

FEDERAL AVIATION
ADMINISTRATION,

      Respondent.

No. 23-9608
(FAA No. 999995312)
(Federal Aviation Administration)

---

## ORDER AND JUDGMENT[*]

---

Before **TYMKOVICH**, **PHILLIPS**, and **CARSON**, Circuit Judges.

---

Elizabeth Wright-Smith petitions for review of the Federal Aviation Administration's decision to terminate her status as a designated pilot examiner, alleging the FAA failed to comply with its own termination procedures. Because Wright-Smith has not shown that the FAA's violation of its procedure prejudiced her, we deny her petition for review.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# BACKGROUND

From 2013 to 2023, Wright-Smith served as a designated pilot examiner (DPE) for the FAA. As a DPE, Wright-Smith was authorized to conduct flight examinations and to issue FAA certificates to pilots. 49 U.S.C. § 44702(d). Her status was renewed annually, and the record reveals no negative performance evaluations during those ten years.

On July 7, 2023, the FAA received the following anonymous complaint on its "FAA Hotline":[1]

> Word on the street is there are some juicy details floating around the Albuquerque NM hot air balloon scene. So, FAA Beth Wright-smith, who's supposed to test private and commercial hot air balloon pilots for the FAA a designated pilot examiner Dpe for Albuquerque Fsdo at the FAA, paid a visit to our local Albuquerque, NM hot air balloon FAA repair center, AERCO run by David and Jared. And get this, she straight-up threatened them-to not fix or inspect the balloons of her competitor and arch-rival [REDACTED] a pilot trainer and commercial pilot in the balloon community and anyone else who she hates-if AERCO knows what is good for there business. Talk about a major threat to AERCO [REDACTED] and the other ABQ balloon owners and pilots! Not being able to buy proper balloon maintenance and yearly inspections seriously messes with aviation safety, FAA! – The BIG thing is, Beth Wright-smith has some serious clout in the ABQ balloon scene. She's got this special FAA status, she's in the spotlight, and she's a big shot in AAAA ballooning and ABQ Balloon Fiesta. The FAA should freak out that one of their representatives is making them and the whole balloon world look bad and unsafe. They might wanna consider giving her the boot and slapping her with a hefty fine! FAA do the write thing and investigate this mess. We've got some rotten apples in our balloon world here in ABQ, and it's time to sort it out! Can't we all just get

---

[1] The FAA accepts both informal reports and formal written complaints. 14 C.F.R. §§ 13.2, 13.5. The FAA's Hotline Program is one way the FAA receives informal reports. *See* FAA Order 1070.1A.

along and stop with these pathetic pissant feuds? Thanks for your
time, and let's hope for some resolution.

AR at 1. On July 12, Wright-Smith's immediate supervisor, managing specialist
Gary Medina,[2] notified Wright-Smith of the Hotline Complaint and temporarily
suspended her as a DPE. He and FAA Inspector Raymond Romero interviewed
her about the Hotline Complaint the next day. At the interview, Medina read
the Hotline Complaint to Wright-Smith. Wright-Smith "denied [the] allegations
[in the Hotline Complaint] and stated that she had never spoken negatively
about [her competitor] with the Repair Station or anyone else in the balloon
community." *Id.* at 12. She acknowledged that she'd had what she described as
"a private conversation" about her competitor with Jared Scutt, one of the
repair shop owners identified in the Hotline Complaint,[3] to caution him that the
competitor had filed an unfounded Hotline Complaint against a Colorado pilot
based on statements attributed to Scutt. *Id.* at 3, 12, 33. She told Medina and
Romero that she would make no such comments in the future and would
participate in any corrective action the FAA deemed appropriate.

---

[2] Designees have a managing officer and managing specialist for each
designation type (e.g., pilot examiner). The managing specialist has "regulatory
oversight responsibility of designees and must monitor them to ensure that they
continue to meet the requirements of their designations." AR at 86.

[3] The FAA refers to Jared Scutt as a repairman in its brief and
Investigative Results Report (IRR). But best we can tell from the rest of the
administrative record, Scutt is a co-owner with David Eichhorn.

Wright-Smith requested a "suspension release" several days after the interview, but the FAA denied the request. *Id.* at 3–4. Wright-Smith next heard from the FAA on September 7, 2023, six weeks later, when she received a termination notice through the Designee Management System (DMS). The notice included this language:

> Your designation is being terminated for the following reason:
>
> - Lack of integrity (for example, making false statements, misrepresenting information, failing to disclose pertinent information, etc)
>
> - Misconduct (for example, purposefully not following prescribed procedures for gain; etc)
>
> - Inability to work constructively with FAA or public (for example, failure to return phone calls, follow guidance, exhibit a cooperative attitude, etc.)
>
> Justification: During July 2023, the Albuquerque FSDO received and investigated an FAA Safety Hotline Complaint against the DPE, and based on the comprehensive FAA investigation, the allegations were substantiated.

*Id.* at 17. The termination notice informed Wright-Smith of her right, under the FAA's Designee Management Policy, to appeal the termination decision. FAA Order 8000.95B, vol. 1, ch. 11, ¶ 2(a). But the termination notice provided Wright-Smith no details of the investigation.

On petition for review, the FAA has disclosed Medina's internal Investigative Results Report (IRR), which summarizes the evidence and result of the investigation. Medina and Romero interviewed Jared Scutt and David Eichhorn, co-owners of the AERCO repair station, on the same day of Wright-

4

Smith's interview. According to the IRR, both men were "extremely reluctant" to talk but revealed that Wright-Smith had indeed visited and "made statements as alleged in the Hotline Complaint." AR at 11. Eichhorn told investigators that Wright-Smith had made her statements "in front of a group of people." *Id.*

The investigators also interviewed Wright-Smith's competitor (referred to as the Commercial Pilot), who told them that she had spoken to Scutt and learned that Wright-Smith had made the negative comments at the repair station. In the IRR, Medina also reported that during Wright-Smith's interview, Wright-Smith "expressed strong negative sentiments about [her competitor], referring to her as an 'evil bitch, lying, conniving' person 'who did not belong in ballooning.'" *Id.* at 12. Based on all the interviews, the investigators concluded that the Hotline Complaint was substantiated. They relied on only verbal statements from the witnesses, discrediting their later-provided, contradictory written statements. The IRR does not include these two written statements, and the FAA has never provided them to Wright-Smith or included them in the administrative record.

In appealing the termination of her DPE certificate, Wright-Smith submitted a memorandum of law; affidavits of Scutt and Eichhorn; a favorable affidavit from Matthew Grote, the owner of a different repair station; and an affidavit from herself. In addition, she provided seventeen letters from students, former supervisors, and industry colleagues. She argued that the allegations in the Hotline Complaint were false, and that the FAA violated its

own policies during the termination process. On October 25, 2023, the FAA appeal panel denied her appeal, concluding that it was "unable to find any justification to overturn the termination of [Wright-Smith's] designation." *Id.* at 61.

Under 49 U.S.C. § 46110, Wright-Smith filed the present petition for review.

## STANDARD OF REVIEW

We have jurisdiction to review a final FAA order under 49 U.S.C. § 46110. But because the FAA "may rescind a delegation . . . at any time for any reason that the Administrator considers appropriate," 49 U.S.C. § 44702(d)(2), our jurisdiction is limited to "whether the FAA met its procedural requirements." *Bradshaw v. FAA*, 8 F.4th 1215, 1222 (D.C. Cir. 2021) (citation omitted); *see also Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("The [*United States ex rel.*] *Accardi* [*v. Shaughnessy*, 347 U.S. 260 (1954)] doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions.").[4]

---

[4] Our circuit has only two cases, both unpublished, addressing the FAA's obligation to follow its own procedures for designees: *Holt v. FAA*, No. 98-9544, 1999 WL 617714, *1 (10th Cir. Aug. 16, 1999) and *Marcy v. FAA*, No. 90-9506, 1991 WL 114660, *6 (10th Cir. June 26, 1991).

To succeed in her petition, Wright-Smith "must show that the FAA 'fell substantially short' of the applicable procedural requirements," *Bradshaw*, 8 F.4th at 1223 (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959)), prejudicing her.[5]

## DISCUSSION

Wright-Smith alleges three procedural violations: (1) that the FAA failed to properly document the results of its Hotline Complaint investigation, (2) that it failed to state the specific reasons for termination, and (3) that it failed to consider Wright-Smith's overall performance in its termination decision.[6] We begin by identifying the procedural requirements and then assess the FAA's compliance with them. For any noncompliance, we assess whether Wright-Smith has shown prejudice.

## I.    Compliance with Procedures

Wright-Smith alleges violations of two FAA orders: Order 8000.95B (Designee Management Policy) and Order 1070.1A (FAA Hotline Program).

---

[5] Because the parties agree that prejudice is required, we accept the requirement for the purposes of this case. But we reserve the ability to consider this matter in a future case in which that is disputed. *See Guangdong Chem. Import & Export Corp. v. United States*, 414 F. Supp. 2d 1300, 1306 (Ct. Int'l Trade 2006) (identifying divergent views on a prejudice requirement from the 2nd, 5th, 9th, 11th, and D.C. Circuits).

[6] Wright-Smith also argued that the FAA failed to comply with its appeal panel requirements but based on information provided in the FAA's appendix to its response brief, Wright-Smith acknowledges that this argument is obsolete.

FAA Order 8000.95B is "a comprehensive publication establishing policy and procedures for managing all aspects of certain representatives of the [FAA] Administrator."[7] AR at 66. Volume 1 is the Common Designee Policy that applies to all designees and Volume 3 gives specific guidance for DPEs. Important to this case are Chapter 6 (Oversight and Management of a Designee), Chapter 9 (Termination of a Designation), and Chapter 11 (Appealing a Termination For Cause) from both volumes. FAA Order 1070.1A "establishes the operations, responsibilities, and requirements of the [FAA] Hotline Program." *Id.* at 167.

Though we discuss only the relevant provisions for this appeal, we consider the entire order when interpreting a provision's meaning.

### A.    Properly Document the Results of the Investigation

First, Wright-Smith argues that Chapter 6 (Oversight and Management of a Designee) and Order 1070.1A require managing specialists to document the outcome of oversight activities, including Hotline Complaint investigations, and include in the IRR the evidence gathered in the course of the investigation. Op. Br. at 21 (citing FAA Order 8000.95B, vol. 1, ch. 6, ¶ 3; vol. 3, ch. 6, ¶ 3(d); FAA Order 1070.1A, ¶ 6(o)). Wright-Smith says this documentation

---

[7] Order 8000.95B was replaced by Order 8000.95C on September 21, 2023. Wright-Smith initiated her administrative appeal on September 20. She presented arguments under both orders in her opening brief, but the FAA clarified in its response brief that Order 8000.95B is the appropriate order. We consider only Order 8000.95B.

must include the written witness statements of Scutt and Eichhorn, which
Medina stated in his IRR were contrary to what they told him in person.
AR at 13. The FAA responds that (1) Order 1070.1A does not provide Wright-
Smith with any procedural rights; (2) Chapter 6 "refers to a systemic safety-
related review process" and therefore does not apply to Wright-Smith's
"non-safety related" termination; (3) even if Chapter 6 applied, the
documentation "requirement" is merely advisory; and (4) even if documentation
were required, the IRR satisfies the requirement. Resp. Br. at 14–16.

    We start with Order 1070.1A, the policy for Hotline Complaints. The
FAA argues that Order 1070.1A is merely "a statutory obligation to review
complaints" and "is intended to protect individuals who report misconduct—not
to protect the subjects of complaints." *Id.* at 17 (citing 49 U.S.C. § 46101(a)(1)
and 14 C.F.R. § 13.2). It asserts that "the policy reinforces that conclusion by
conferring appeal rights only on reporting individuals." *Id.* (citing FAA Order
1070.1A, ¶ 9(f).

    In considering a procedural claim, we ask whether "the procedures in
question were designed to protect the [rights of the petitioner]" or were
"designed to promote some other agency goal." *Rosenberg v. CIR*, 450 F.2d
529, 532 (10th Cir. 1971) (internal quotation marks omitted); *see also United
States v. Lockyer*, 448 F.2d 417, 421 (10th Cir. 1971) (explaining that the
directive did not fall under *Accardi* because "[t]he entire design and thrust . . .
is that of internal administration"); *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir.

2003) (explaining the importance of distinguishing between "procedural rules benefitting the agency" and "procedural rules benefitting the party otherwise left unprotected by agency rules").

Wright-Smith acknowledges that a purpose of the policy is "ensuring that the FAA properly investigates and resolves/responds to the issues raised by a hotline complaint," but argues that the context of this case shows that the policy is also "for the benefit of designees" because the outcome of the investigation here "was the *only* justification offered for [her] termination." Reply Br. at 8. But Wright-Smith appears to confuse "benefit" with "protect"— the question is not whether designees would benefit from the Hotline Complaint policy, but whether the policy *was designed to protect* designees. *Rosenberg*, 450 F.2d at 532. Wright-Smith has not pointed to any provision in Order 1070.1A that even hints at a purpose of protecting designees. There is no such provision. Order 1070.1A was not designed to protect designees, so "Wright-Smith cannot claim [its] protections." Resp. Br. at 17; *cf. Barrie v. FAA*, 16 F. App'x 930, 934 (10th Cir. 2001) (denying procedural claim brought by an aircraft operator because the procedures he invoked did not "exist to protect the rights of aircraft operators").

Next, we turn to Chapter 6. As the FAA says, Chapter 6 is intended to promote safety. FAA Order 8000.95B, vol. 1, ch. 6, ¶ 2(a)(1). But it is also used to evaluate performance. *Id.* ¶ 2(a)(2). It stresses the importance of documenting oversight activities in DMS so that "the FAA can make an overall

assessment of the designee's performance." *Id*. ¶ 2(c). The "results of investigation or inquiry" is one such "oversight activity." *Id.* ¶ 2(c)(2)(c). And though "[m]anaging specialists may use DMS to plan," they "must use DMS to document the outcome of oversight activities." *Id.* ¶ 3; *see also id.* at ch. 1, ¶ 9(a) (listing "must" as a mandatory directive).

This mandatory language supports Wright-Smith's argument that the FAA was required to document the results of the investigation in DMS. But the FAA points to contradictory language in the corresponding chapter in Volume 3: "The managing specialist *should* record in DMS the results of individual oversight activities" and "must record in DMS a formal evaluation at least once every 36 calendar-months." *Id.* at vol. 3, ch. 6, ¶ 2(c)(2) (emphasis added); *see also id.* at vol. 1, ch. 1, ¶ 9(b) (listing "should" as permissive). But the FAA has not explained why Volume 3 overrides Volume 1. And nothing in Order 8000.95B advises how to resolve direct conflicts between the volumes. *Cf. id.* at vol. 1, ch. 12, ¶ 4(c) (stating that "[a]dditional information can be found in the appropriate type-specific volumes"). In resolving the stated conflict, we will use Volume 1, because Volume 3 merely "supplements Volume 1." *Id.* at vol. 3, ch. 1, § 1, ¶ 1.

So we read Order 8000.95B to require Medina to document the outcome of the Hotline Complaint investigation in DMS. But what does "document" mean? Does it require a full summary, like the IRR? Or does it just require a

short notation? Neither party parses the language or makes a textual argument one way or the other. And Order 8000.95B provides no definition.

So to define "document," we look at other provisions in the order. We note that while paragraph 2(c)(2)(c) states "[d]ocument results of investigation or inquiry," other paragraphs in Chapter 6 state "document the outcome," "record the outcome," and "record . . . the results." *Id.* at vol. 1, ch. 6, ¶¶ 2(c), 3; *id.* at vol. 3, ch. 6, ¶ 2(c)(2). So "document" and "record" seem synonymous, as do "result" and "outcome." Chapter 6 lists different "outcomes" for oversight activities that must be documented: Satisfactory, Needs Improvement, and Unsatisfactory. *Id.* at vol. 3, ch. 6, ¶ 3(d); *id.* at vol. 1, ch. 6, ¶ 3(c)(1). If the outcome is "Needs Improvement" or "Unsatisfactory," then "the managing specialist must enter descriptive text." *Id.* at vol. 1, ch. 6, ¶ 3(c)(1). So to "document" is to provide something less than "descriptive text." Another provision states that DMS will capture and manage data, "including the substantiation and documentation of the decisions." *Id.* at ch. 1, § 2, ¶ 5(a). To "document" is not to "substantiate."

Based on these provisions, we conclude that "document" simply means "state." The requirement that managing specialists document the "results of [an] investigation" in DMS could be satisfied by something as simple as "claims substantiated." We agree with the FAA that the IRR would more than satisfy this requirement, but the administrative record does not establish that Medina documented the IRR on DMS. Even so, the termination notice sent to

Wright-Smith through DMS satisfies the documentation requirement. AR at 15, 17 ("[T]he allegations were substantiated."). We deny Wright-Smith's petition for review on this claim.

### B.    Specific Reasons for Termination

Second, Wright-Smith argues that the FAA prevented her from presenting an effective agency appeal by concealing from her the specific reasons for her termination. She relies on Chapter 9 (Termination of a Designation), which says the FAA must "formally document" the termination decision in DMS and "include the specific reason(s) for termination." *Id.* at ch. 9, ¶¶ 4(a), (b). The FAA responds that by using its template to document the termination decision, it necessarily complied with the specificity requirement. Resp. Br. at 12 (citing *Sheble v. Huerta*, 755 F.3d 954, 958 (D.C. Cir. 2014) (holding that adherence to an agency template "substantially complie[s] with the FAA's internal procedures")). But Wright-Smith asserts that the FAA did not properly adhere to its form, so the FAA fell "substantially short" of the requirement. Op. Br. at 23. The FAA alternatively argues that the IRR satisfied the specificity requirement. Resp. Br. at 13–14.

When terminating a designation, "[t]he FAA must document termination decisions in DMS and include the specific reason(s) for the termination." FAA Order 8000.95B, vol. 1, ch. 9, ¶ 4(a)(1). Then the appointing official must "approve or deny the termination recommendation through DMS." *Id.* ¶ 4(b)(1). "Depending on the reasons for termination, the designee may request an

13

appeal." *Id.* ¶ 4(b)(4); *see also id.* at ch. 11, ¶ 1 (providing the appellate procedures for for-cause terminations).

We disagree that paragraphs 4(a)(1) and 4(b)(1) create a requirement that the FAA *provide Wright-Smith* with the specific reasons for her termination. Those paragraphs say that the documentation is in DMS. DMS is "a web-based tool designed to standardize the management of designees," suggesting the FAA primarily uses DMS for its own internal organization. FAA Order 8000.95B Cover Page. And while the FAA also uses DMS to communicate with designees, *id.* at vol. 1, ch. 6, ¶ 5(d) ("Send Message to Designee"), DMS's communication requirements are plainly stated, *see, e.g.*, *id.* at ch. 9, ¶ 4(b)(3) ("DMS will generate and send an electronic termination notice to the designee."); *id.* at ch. 11, ¶ 2(e) ("DMS will notify the designee of the appeal panel's decision within 15 calendar-days of a decision."). If the order specifies in other paragraphs when DMS will "notify the designee" or "generate and send" a notice, then the absence of such language in 4(a)(1) and 4(b)(1) means that information is *not* required to be sent to the designee. Paragraphs 4(a)(1) and (b)(1) require *internal* documentation of the termination decision, and that internal documentation must "include the specific reason" for termination. *Id.* at ch. 9, ¶¶ 4(a)(1), (b)(1).

Even so, paragraph 4(b)(4) implicitly requires the FAA to communicate the specific reasons for termination to the designee. *Id.* ¶ 4(b)(4) ("Depending on the reasons for termination, the designee may request an appeal."). Whether

14

a designee may request an appeal "[d]epend[s] on the reasons for termination."
*Id.* For that provision to have meaning, the FAA must provide the designee with
the reasons for termination. How specific those reasons must be depends on a
designee's appeal rights under Chapter 11 (Appealing a Termination for
Cause).

Chapter 11 says "[t]he appeal is intended to be a review of the
termination for cause process." *Id.* at ch. 11, ¶ 2(b). The FAA argues that
provision means the appeal panels may not consider "the appropriateness of the
decision to terminate the designation." Resp. Br. at 18. But if that were correct,
the limitation of appeals to only "for cause" terminations would be odd. A "not
for cause" termination has the same procedures as a "for cause" termination.
FAA Order 8000.95B, vol. 1, ch. 9, ¶ 4. The only difference is the reason for
termination. *Id.* ¶¶ 4(c)(1), 4(c)(2). We acknowledge that the FAA has the
discretion to write a policy that protects the procedural rights of designees
terminated only for-cause, but we see no reason to think that's what the FAA
intended here. Giving appeal rights solely to those terminated for cause makes
sense because the underlying "cause" for termination could be mistaken. That
Chapter 11 instructs designees to "provide any evidence to support their case at
the time the appeal is initiated," *id.* at ch. 11, ¶ 2(a), provides additional
support for this interpretation. And the appeal panel may either uphold the
termination decision or overturn it (not "remand" it). *Id.* ¶ 2(c). The right to a
substantive appeal flows from the text and purpose of Order 8000.95B.

Therefore, the reasons for termination must be clear enough for the designee to mount an effective substantive appeal.

So now we look at the reasons for termination. Using its termination template, the FAA purported to provide Wright-Smith with three "reasons" for termination and one "justification." Its stated three reasons were general: (1) lack of integrity, (2) misconduct, and (3) inability to work constructively with the FAA or the public. Its justification was also conclusory: "During July 2023, the Albuquerque FSDO received and investigated an FAA Safety Hotline Complaint against the DPE, and based on the comprehensive FAA investigation, the allegations were substantiated." AR at 17. We hold that these reasons were inadequate to provide Wright-Smith the required notice for an effective appeal.

The FAA argues that it complied with its procedures by using an FAA template. *Sheble*, 755 F.3d at 958; *Bradshaw*, 8 F.4th at 1223. But the reasoning in *Sheble* and *Bradshaw* does not apply here because we are interpreting different provisions. *Sheble* and *Bradshaw* interpreted Order 8900.1. That order stated: "The FAA office manager will provide to the designee, in writing, the decision regarding the termination of a designation, with the reasons cited as specifically as possible." *Bradshaw*, 8 F.4th at 1223

(quoting FAA Order 8900.1, vol. 13, ch. 5, § 3, 13-467, ¶ B).[8] The requirement to provide the designee with specific reasons was explicit. The FAA template in those cases was provided in the order itself, as an example of the specificity requirement. *Sheble*, 755 F.3d at 957–58 (citing FAA Order 8900.1, vol. 13, ch. 5, § 3, at 3, fig. 13-4). So it made sense that adherence to the template would satisfy the FAA's specificity requirement—the template was a direct reflection of what "as specific as possible" meant. But here, the specificity requirement arises not from an explicit right to receive a termination letter with the reasons, but implicitly, from the right to appeal the termination decision. As stated above, for that provision to have meaning, the termination reasons must be specific enough for the designee to appeal the termination. Adherence to the FAA's termination template does not necessarily satisfy that requirement.

The parties' arguments about the FAA's adherence to its termination template do not address whether a designee is able to effectively appeal the termination. To effectively appeal a termination based on "substantiated allegations," the designee must know the allegations and the substantiating bases. Here, the FAA's general "reasons" and stated justification say almost nothing. If we were to find these "reasons" sufficient, we would be reading the

---

[8] We have not located the relevant provision on the FAA website so we rely on *Bradshaw* for the relevant text.

right to an appeal out of Order 8000.95B. We will not do so. The FAA provided conclusions, not reasons, and so it failed to comply with paragraph 4(b)(4).

### C.     Consider Overall Performance

Finally, Wright-Smith argues that, under Chapter 6 (Oversight and Management of a Designee), the FAA was required to consider her overall performance—"her ten years as a DPE without a single deficiency." Op. Br. at 22. The language she relies on states: "Oversight is not merely an isolated event" and "should be considered in total to provide a high-level perspective of a designee's performance over time." FAA Order 8000.95B, vol. 1, ch. 6, ¶ 2(a). The FAA's short response is that the oversight provisions "can[not] be stretched to include a requirement to discuss [Wright-Smith's] track record as a designee." Resp. Br. at 16.

We agree with the FAA. None of the provisions in Chapter 6 or Chapter 9 mention, let alone require, considering a designee's overall performance *before termination*. The cited language from Chapter 6 is unrelated to the termination process, Chapter 9 does not mention oversight at all, and neither chapter references the other. The general statement about considering a designee's total performance cannot independently support a requirement to consider a designee's overall performance before termination. The FAA was not required to consider Wright-Smith's overall performance, so there was no violation. We deny Wright-Smith's petition for review on this claim.

**II.    Prejudice**

Because we find that the FAA failed to provide Wright-Smith with sufficient reasons for her termination, we now consider whether this violation prejudiced Wright-Smith by preventing her from effectively appealing her termination.

Despite the FAA's failing to provide sufficient reasons and justification in its termination notice, Wright-Smith has not shown prejudice. Wright-Smith argues that because she was never provided a copy of the Hotline Complaint, she had to guess which of two possible repair stations the Hotline Complaint referenced and what the termination reasons were, leading her to devote resources to arguments not relevant to the actual decision. But the record makes it obvious that Wright-Smith knew why she was terminated.

Wright-Smith knew the contents of the Hotline Complaint because Medina read it to her at their interview meeting. The Hotline Complaint specifically mentioned the "FAA repair center, AERCO run by David and Jared." AR at 1. So Wright-Smith understood the Hotline Complaint to concern the recent conversation she'd had with Jared Scutt and David Eichhorn at AERCO. *See* Op. Br. at 12 ("Wright-Smith explained that she had a *private* conversation with repair station owner Jared Scutt, in which she commented that Scutt should be careful about what he told [the competitor,] who had filed a previous, unfounded Hotline Complaint (based on statements attributed to Scutt) against a Colorado pilot."); AR at 3 (Designation Suspension Removal

19

Request) (denying the allegation from her meeting with Medina and stating "I spoke with the owner of a local repair station when I took my equipment to the repair station for repair . . . . My comment to the repair station owner later (in private) was that he should be careful about what he told the local pilot"); *id*. at 12 (IRR) ("The DPE then mentioned having a *'private conversation'* at the Repair Station where 'the [competitor] was part of the discussion.'").

Wright-Smith's memorandum of law in support of her administrative appeal also makes plain her knowledge: "Wright-Smith and Scutt had a conversation—alone, outside the Aerco building—in which Wright-Smith advised Scutt to be careful what he says to [REDACTED]." *Id.* at 24–25. Wright-Smith also said that "she did not caution Scutt about his business." *Id.* at 25. And despite not receiving a copy of the Hotline Complaint, Wright-Smith accurately (with one non-substantive error) quoted from it in her memorandum of law and affidavit, further indicating that she remembered and understood the allegations.[9]

---

[9] *Compare* AR at 24 ("word on the street is there are some juicy details floating around the Albuquerque, New Mexico hot air balloon scene"), *with id.* at 1 ("word on the street is there are some juicy details floating around the Albuquerque NM hot air balloon scene").

*Compare id.* at 24 ("flat out threatened"), *with id.* at 1 ("*straight-up* threatened").

*Compare id.* at 24 ("not to fix or inspect the balloons of [REDACTED] . . . and anyone who she hates if they know what's good for their business"), *with id.* at 1 ("not to fix or inspect the balloons of *her competitor* . . . and anyone else who she hates-if *AERCO* knows what is good for there [sic] business").

Even assuming that Wright-Smith had to guess in her administrative appeal about the repair shop referenced in the Hotline Complaint, she guessed correctly. Wright-Smith obtained (identical) affidavits from Scutt and Eichhorn that stated:

> On or about July 11, 2023, two FAA officials came to Aerco and spoke with me about Elizabeth Wright-Smith. Specifically, they asked if she threatened Aerco's business if we continued to do business with [REDACTED], a local hot air balloon pilot. I told them Wright-Smith did not make any such comment to me and has never suggested we not do business with any individual or company.

*Id.* at 35–36. Wright-Smith offers no reason to think that she could have done more for that piece.

Wright-Smith's memorandum of law and affidavit thoroughly addressed the allegations in the complaint, proclaiming that the "openly spiteful" anonymous complaint was "blatant gossip" that was "directly contradicted by the sworn statements of the repair station owners themselves, and by Wright-Smith's own statements to the FSDO and in [her] affidavit." *Id.* at 22, 24, 32 (citations omitted). In her affidavit, she stated, "I did not make such a threat nor tell any repair station to stop doing business with anyone and have attached affidavits from the owners of both repair stations in the Albuquerque area that support my denial." *Id.* at 32. She also mentioned her conversation with Scutt at AERCO:

> During a visit to Aerco for inflator fan repairs, I spoke with Jared Scutt who is a friend and former crew member of mine. That conversation was conducted with only Scutt and me present, outside the Aerco building. I stated he should be careful what he says to

21

[REDACTED] because I had been told that, based solely on a statement by Scutt taken out of context, she accused two of Aerco's other customers of flying dangerously and damaging their balloon during a flight.

*Id.* at 33.

Even Wright-Smith's "incorrect guesses" helped her appeal. Wright-Smith had time to obtain an affidavit from the other repair station's owner, which stated, "I have never been contacted by any FAA official concerning Elizabeth Wright-Smith." *Id.* at 37. And the letters from her students, peers, and mentees demonstrated that Wright-Smith had a positive reputation in the ballooning community.

Having read the materials in Wright-Smith's administrative appeal, we are confident that Wright-Smith was able to effectively appeal her termination. She was not prejudiced by the FAA's failure to provide the specific reasons for her termination, so we deny her petition for review. *See Lopez*, 318 F.3d at 249 (denying petition for review "because any FAA failure to follow internal [] procedures caused no prejudice").

Before concluding, we briefly address the FAA's argument that Wright-Smith suffered no prejudice. The FAA asserts that the error could not have changed the appeal panel's determination because the appeal panel reviews only the "termination for cause *process*—not the substantive decision." Resp. Br. at 17 (citing FAA Order 8000.95B, vol. 1, ch. 11, ¶ 2(b)). But we already addressed the scope of the right to appeal a termination decision. And even if

success in her appeal were unlikely, "a procedural error is not made harmless simply because the government employee appears to have had little chance of success on the merits anyway." *Mazaleski v. Treusdell*, 562 F.2d 702, 719 n.41 (D.C. Cir. 1977) (citing *Bell v. United States*, 366 U.S. 393, 413–14 (1961)). The FAA's error here was not prejudicial, because Wright-Smith was on sufficient notice so that she could present an effective appeal.

## CONCLUSION

We do not endorse the FAA's conduct in this case. Even in her petition for review before us, Wright-Smith had to abandon an argument in her opening brief because the FAA produced evidence of its compliance with policy, for the first time, in its appendix to its response brief. It seems to us that all parties would be best served by transparency in termination decisions. But in Wright-Smith's case, the FAA's conduct was not prejudicial. Accordingly, we deny her petition for review in its entirety.

Entered for the Court


Gregory A. Phillips
Circuit Judge